EDWARD I. BOBBITT AND GLORIA N. BOBBITT, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Bobbitt v. Commissioner
Docket Nos. 32432-83, 22626-84.
United States Tax Court
T.C. Memo 1987-328; 1987 Tax Ct. Memo LEXIS 328; 53 T.C.M. (CCH) 1285; T.C.M. (RIA) 87328; June 29, 1987. Stephen A. Crane,Robert J. Morris, Jr. and Merritt A. Gardner, for the petitioners. Willie Fortenberry, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar *330 years 1979, 1980 and 1981 and additions to tax for fraud under section 6653(b)[1] as follows: Additions to Tax
Year
Deficiency
Section 6653(b)
1979
$64,277.05
$32,138.52
1980
68,225.01
34,127.51
1981
169,300.34
84,650.17
By amended answer respondent claimed increased deficiencies and additions to tax for the year 1980 in the amount of $21,602.90 and $10,801.44, respectively and for the year 1981 the amount of $47,045.35 and $23,522.67, respectively. Many of the issues raised by the pleadings in these cases have been disposed of by the parties, leaving for our decision only the following: (1) Whether both or either of petitioners are liable for the additions to tax for fraud under section 6653(b) in each of the years 1979, 1980 and 1981; (2) if petitioners' return for the year 1979 was not false and fraudulent, whether the running of the statute of limitations on the assessment and collection of any additional *331 tax for that year was suspended under the provisions of section 7609(e) by an intervention requiring an enforcement proceeding with respect to a third party summons issued by respondent's agent; and (3) whether damages under the provisions of section 6673 should be assessed against petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Titusville, Florida at the time of the filing of their petitions in these cases. Petitioners filed joint Federal income tax returns for each of the calendar years 1979, 1980 and 1981 with the Director, Atlanta Service Center, Doraville, Georgia. During the years here in issue and for sometime prior and subsequent thereto, Mr. Bobbitt (petitioner) was employed by one or more corporations which were in the business of manufacturing and selling bridge decking. All of the stock of these corporations was owned by petitioners. These corporations were Qup-Co., Inc., In Place Corporation and a corporation which at one time was named the Bobbitt Corporation and at another time, Stockwatch Southeast, Inc.
During the years here in issue Mrs. Bobbitt was a full-time *332 homemaker. In some of the years prior to the years here in issue, she had been employed from time to time as a keypunch operator. During the years here in issue petitioners had been married for 27 to 30 years and had two adopted children. Petitioner received his high school diploma while he was in military service and, subsequently, completed one year of college. He had no other formal education. Mrs. Bobbitt completed high school and had no further formal education. Mrs. Bobbitt was a practicing Roman Catholic. Petitioner had been reared as a Methodist, but claimed no formal religious affiliation during the years here in issue. They both regularly attended a Roman Catholic church in Titusville, Florida with their children. Petitioner, in the late spring or early summer of 1979, saw newspaper and magazine articles, and at least one television broadcast, concerning the Universal Life Church, Inc. (ULC). A friend of Mr. Bobbitt's also gave him a brochure on the organization of ULC. After reading this brochure, petitioner called ULC's headquarters in Modesto, California, and requested that he be sent a brochure. After receiving this brochure, petitioner applied for a set *333 of operational instructions and information, including two audio cassette tapes, which were published by the church and distributed. After reviewing this material, petitioner applied for a charter for his own congregation of the church and later received such a charter, and he and Mrs. Bobbitt were both ordained as a "minister of the church." These documents were received by petitioner during the months of August and September, 1979. Mrs. Bobbitt agreed to be an ordained minister at Mr. Bobbitt's request. The literature and audio cassette tapes petitioner received from ULC in August and September of 1979, included numerous representations with respect to the Federal income tax consequences of church affiliation. Many of these references were to the tax-exempt status of ULC, including a copy of a ruling to that effect by the Internal Revenue Service, and references to the deductibility of contributions to ULC. The documents also contained references to the exempt status of income earned by ULC and its congregations and references to a minister's right to draw exempt housing, food, automobile and similar allowances. The literature also contained statements that ULC and its various *334 congregations were one and the same organization, with each congregation automatically entitled to the same tax-exempt status as ULC, despite the different names and geographical locations of the various congregations. On August 28, 1979, petitioner was issued a certificate of "credentials" as a minister of ULC and on September 14, 1979, a separate charter and charter number was issued to a congregation of ULC at petitioner's home address in Titusville, Florida, including the execution of a charter agreement on that same day. On October 21, 1979, Mrs. Bobbitt was issued a certificate of "credentials" as a minister of ULC. Following instructions that he considered to be in the literature he received, petitioner held an initial meeting of the board of directors of his congregation. The board consisted of petitioner, Mrs. Bobbitt and Mrs. Bobbitt's mother. Petitioner also prepared a set of books and records for the congregation, held an election of officers and designated the name of the congregation as the "Oak Royal Universal Life Church Charter No. 31584." At meetings of the board of directors, the Oak Royal Universal Life Church Charter No. 31584 (Oak Royal) authorized Oak Royal *335 to rent a post office box and bank accounts to be opened on its behalf by petitioner. The post office box obtained in the name of Oak Royal Universal Life Church was Box 1001, Titusville, Florida. In 1979, petitioner opened a checking account at the Flagship First National Bank of Titusville in the name of Oak Royal and a savings account at the Flagship First National Bank in this same name. Petitioner also opened a bank account at the Brandon State Bank, and in 1980 opened a security account at Merrill Lynch, Pierce, Fenner & Smith, Inc. and in 1981 opened a ready asset trust account at Merrill Lynch, Pierce, Fenner & Smith, Inc., all in the name of Oak Royal. Petitioner and Mrs. Bobbitt were the persons authorized to make withdrawals from these accounts. On August 31, 1979, petitioner and Mrs. Bobbitt purchased a certificate of deposit from the American Bank of Merritt Island in the amount of $30,000. This certificate was issued in their names. On December 24, 1979, petitioner directed an officer of the American Bank of Merritt Island to transfer this certificate into the name of Oak Royal. On August 31, 1979, petitioners purchased a certificate of deposit from the American *336 Bank of Merritt Island in the amount of $50,000. This certificate was issued in the names of petitioner and Mrs. Bobbitt. On December 24, 1979, petitioner directed an officer of the American Bank of Merritt Island to reissue this $50,000 certificate, or transfer the certificate, to the name of Oak Royal. The officer of the bank reissued the two certificates to Oak Royal backdating them to the date of their original issue August 31, 1979, using the same certificate number on each such certificate with the addition of an "A". In addition to the certificates of deposit transferred into the name of Oak Royal, petitioner also in 1979 placed money in the bank accounts opened in the name of Oak Royal. Petitioners did not report the interest on the certificates of deposit issued in the name of Oak Royal on their own Federal income tax returns in 1979, 1980 or 1981 and did not report the interest on the bank accounts in those years or the income on the brokerage account and the ready asset account in the name of Oak Royal on their Federal income tax returns for 1980 and 1981. During the year 1980, a corporation, Urbanetics of Florida, Inc. of Eaton Park, Florida, was indebted to petitioner *337 for services rendered in the amount of $20,280 and at petitioner's request, prepared a check in the name of Oak Royal in that amount to pay for petitioner's services. Also in 1980, Mini-Computer Services, Inc. was indebted to petitioner for services rendered in the amount of $1,865, and at petitioner's direction, prepared a check in the name of Oak Royal in payment for these services. In 1980, Tucker's Heavy Equipment Service, Inc. of Leesburg, Florida was indebted to petitioner for services rendered in the amount of $2,995.89 and at petitioner's direction, prepared a check in the name of Oak Royal in payment for these services. Also in 1980, Atlanta Structural Concrete Company of Powder Springs, Georgia, at petitioner's direction, prepared a check in the amount of $4,241.20 for services rendered by petitioner to that corporation in the name of Oak Royal. Also in 1980 Cast-Crete Corporation of Florida, Tampa, Florida prepared a check in the name of Oak Royal in the amount of $7,500 in payment of services rendered by petitioner. During 1981 Cast-Crete Corporation of Florida, Tampa, Florida was indebted to petitioner for services rendered in the amount of $12,625 and at petitioner's *338 direction, prepared two checks in the name of Oak Royal in payment for these services. One of the checks was in the amount of $5,125 and the other in the amount of $7,500. All the above listed checks prepared in the name of Oak Royal were deposited in an account of Oak Royal. Petitioners on their tax returns for 1979, 1980 and 1981, deducted as charitable contributions the amounts of the certificates of deposit purchased in the name of Oak Royal and the amount of deposits made by them into the bank accounts and brokerage accounts in the name of Oak Royal as charitable contributions. They did not report on their returns any interest on the certificates of deposit or the bank accounts in the name of Oak Royal and did not report as income the amounts of the checks due to petitioner for services rendered made in the name of Oak Royal and deposited to an account of Oak Royal. From 1976, petitioners had been clients of a Mr. Victor Dudley Glover a certified public accountant practicing in Tampa, Florida. Mr. Glover had prepared petitioners' Federal income tax returns and had prepared the corporate tax returns of petitioners' various corporations. Petitioners would meet with Mr. *339 Glover at his office in Tampa after the end of a taxable year, but prior to the preparation of their individual returns, to provide Mr. Glover with their books and records relating to the year covered by the return and to discuss the preparation of their return. Mr. Glover would prepare the returns from the information furnished to him by petitioners and the information furnished to him at the meeting. In early 1980, petitioners met with Mr. Glover in connection with the preparation of their 1979 return. At this meeting, petitioner advised Mr. Glover that he had established a congregation of ULC and had made contributions to that congregation. Petitioner showed Mr. Glover the charter of Oak Royal and requested Mr. Glover's professional opinion as to the propriety of taking deductions for the contributions made to the Oak Royal congregation of the ULC on their 1979 Federal income tax return. Mr. Glover checked the "Cummulative List of Organizations described in section 170(c) of the Internal Revenue Code of 1954" (Cummulative List) and advised petitioner that ULC was on that list and that his congregation was a part of ULC under its charter and, therefore, *340 contributions to the Oak Royal congregation of ULC were deductible. Mr. Glover then prepared petitioners' 1979 tax return taking deductions for the contributions listed by petitioners as being made to their congregation of ULC. He prepared this return on approximately April 10, 1980 and mailed it to petitioners. After petitioners received it, they discovered that the entire $110,000 contribution which they considered they had made to their congregation of ULC, had not been taken and since there was not time to return the return to Mr. Glover, they had a local accountant correct the amount of contributions and prepare the return otherwise as prepared by Mr. Glover. They signed the revised return and filed it. They notified Mr. Glover of the change they had made and Mr. Glover made a notation of this on the copy of the 1979 return which he had retained. Petitioners, in the early part of 1981, met with Mr. Glover with respect to preparing their 1980 return. At this meeting they again mentioned the deductibility of their contributions to their congregation of ULC and Mr. Glover again checked the Cummulative List and advised them that the contributions were deductible. Mr. Glover *341 prepared the 1980 tax return for petitioners, taking as charitable contributions the deductions which petitioners claimed as contributions to their congregation of ULC. The 1981 contributions claimed were $50,000. Petitioner did not advise Mr. Glover of the checks for his services which were made to Oak Royal at his request. Again in early 1982, petitioners met with Mr. Glover and again inquired of him with respect to contributions made in 1981 to their congregation of ULC and Mr. Glover again checked the Cummulative List and advised them that the contributions were legitimate and proper deductions under the Internal Revenue Code. He prepared petitioners' 1981 Federal income tax return taking a $115,000 deduction for transfers made by petitioners to Oak Royal and signed the return as preparer, and this return, as was the 1980 return prepared by Mr. Glover, was filed by petitioners. In the literature which petitioner had received from ULC a suggestion was made that a person could donate his services on behalf of his congregation of ULC and if the beneficiary of those services, issued the check to the congregation of ULC the amount was deductible. Petitioner understood this to *342 mean that he was not required to include in income those amounts if he did not claim a deduction for the value of the services he had rendered to another company or person. During the calendar year 1982 petitioner made cash transfers to Oak Royal. In early 1983, when petitioner met with Mr. Glover, Mr. Glover informed petitioners that contributions to the various congregations of ULC had been challenged by the Internal Revenue Service and that it was not proper for petitioner to deduct amounts transferred to Oak Royal as charitable contributions. Petitioner then withdrew the amount of $80,000 which he had transferred to bank accounts of Oak Royal in 1982 and made no claim for a deduction for this amount on his 1982 tax return. However, although petitioners had invested and reinvested the amounts transferred to Oak Royal during the years 1979, 1980 and 1981, they have never withdrawn any amount of these transfers to be used for any purpose, including any personal benefit or family benefit or any other purpose. At the date of the trial, these funds were still in Oak Royal's accounts and no portion of the funds or income therefrom had been withdrawn by petitioners, although petitioner *343 and Mrs. Bobbitt had the sole control over withdrawing these funds. Qup-Co., Inc. is a small business corporation with a May 31 fiscal year as its taxable year. All of the stock is owned by petitioner. All of the stock of Stockwatch Southeast, Inc. is also owned by petitioner. At various times during Qup-Co.'s taxable year ended May 31, 1981, which spanned petitioners' taxable years 1980 and 1981, petitioner caused Qup-Co. to make cash payments for, or on behalf of, Stockwatch. Mr. Glover treated these transfers as constructive distributions to petitioner. He determined that a total amount of $32,255 during the year 1980 and $62,933.39 during the year 1981 was transferred by Qup-Co. to Stockwatch for the benefit of petitioner and were constructive dividends to him. In preparing the corporate return of Qup-Co. for its taxable year ended May 31, 1981, these constructive distributions were disclosed and reported. However, in the preparation of petitioners' personal returns for 1980 and 1981, the amounts were not reported as dividends. The returns of petitioners for 1980 and 1981 were intially prepared by a member of Mr. Glover's staff and Mr. Glover, in checking these returns, *344 did not catch the error in failure to report the amounts of constructive dividends. When Mr. Glover discovered this error he informed an agent of respondent of the error. In 1981, respondent began an investigation of petitioners' 1979 Federal income tax return. On or about November 20, 1981, an Internal Revenue summons was served on the American Bank of Merritt Island, seeking documentation with respect to accounts of Oak Royal for use in the determination of petitioners' correct 1979 income tax liability. On or about December 3, 1981, an Internal Revenue summons was served on Flagship First National Bank of Titusville seeking documents with respect to Oak Royal for use in determining petitioners' tax liability for the year 1979. On or about December 16, 1981, another Internal Revenue summons was served on the Flagship First National Bank of Titusville for records in the name of Oak Royal for use in determining the correct income tax liability of petitioners for 1979. Notices of the service of these summonses on the Flagship First National Bank were sent to petitioner. After receiving these notices, petitioner, in accordance with the instructions in the material he had received *345 from ULC, Modesto, California, telephoned the office of ULC in Modesto, California and informed a person connected with ULC of the fact of the issuance of the summonses on the Flagship National Bank of Titusville. After the telephone conversation, and in accordance with the request of the person with whom he talked, petitioner sent copies of the summonses on the Flagship National Bank to ULC in Modesto, California. ULC, Modesto, California by "Bishop R. E. Imbeau, Ph.D., Vice-President" sent stay compliance letters, one dated December 9, 1981 and the other dated December 22, 1981, to the Flagship First National Bank of Titusville with respect to the Internal Revenue Service summonses served on the bank on or about December 3, 1981 and December 16, 1981. Copies of both of these stay of compliance letters were sent to petitioner. The letter dated December 9, 1981 and the letter dated December 22, 1981 from ULC, Modesto, California, to the Flagship National Bank each specifically stated that the stay of compliance letters were being transmitted pursuant to Internal Revenue Code section 7609(b)(2)(A&B) and 7605(c). On December 15, 1982, the United States *346 of America filed a petition with the Clerk, U.S. District Court, to judicially enforce the summons served on December 16, 1981 on Canara Jones, Assistant Cashier, Flagship First National Bank of Titusville and the Flagship First National Bank of Titusville. The petition to enforce the Internal Revenue summons was filed in the matter of United States of America, et al. v. Canara Jones, et al., Civil No. 82-691-Orl-Civ-EK (M.D. Fla. 1983). An order to show cause was issued by the court on January 5, 1983 in the matter of United States of America, et al. v. Canara Jones, et al.,supra. An amendment to order to show cause was issued on or about April 20, 1983 in the matter of United States of America, et al. v. Canara Jones, et al.,supra. On May 5, 1983 the court issued an order in this case reciting that at the hearing held on that date: Mr. Edward I. Bobbitt appeared personally and without counsel * * *. The Court having heard the oral representation of taxpayer Edward I. Bobbitt that he and the Oak Royal Universal Life Church, did not oppose the production of the records sought by the Internal Revenue Service * * * enforced the Internal Revenue summons on *347 Canara Jones and the Flagship National Bank of Titusville, served on or about December 16, 1981. The court entered an order of dismissal dated May 31, 1983 in the matter of United States of America, et al. v. Canara Jones, et al.,supra.
Petitioners' joint Federal income tax return for the year 1979 was filed on April 15, 1980. The statutory notice of deficiency for the year 1979 properly addressed was mailed to petitioners by certified mail on September 1, 1983. Respondent in his notices of deficiency to petitioners for the years here in issue made numerous adjustments, including disallowance of deductions claimed for contributions to the Oak Royal congregation of ULC, and the inclusion in petitioners' income of the constructive dividends for amounts transferred by Qup-Co., Inc. to Stockwatch. All of these adjustments have been disposed of by agreement of the parties, some items having been conceded by respondent, and some, including the disallowance of the claimed charitable contributions deductions to the Oak Royal congregation and the inclusion of the constructive dividends in petitioners' income, have been conceded by petitioners. Respondent determined that a part *348 of the deficiency in each year was due to fraud and determined the addition to tax for fraud. OPINION Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud there shall be added to the tax an amount equal to fifty-percent of the underpayment. The burden to establish fraud is on respondent. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. Respondent must carry this burden of establishing fraud by clear and convincing evidence, Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). The issue is one of fact to be determined from the entire record in the case. Stratton v. Commissioner,54 T.C. 255, 284 (1970). After a review of the entire record in these cases, we conclude that respondent has failed to carry his burden of establishing that any part of the underpayment in any of the years here in issue was due to fraud with intent to evade tax. The record shows that petitioner read the literature from ULC and concluded that in accordance with the representations therein, *349 he could establish a charter of ULC and deduct amounts paid into an account opened in the name of that congregation of ULC. However, he did consult his accountant and his interpretation of the literature from ULC was reenforced by the accountant telling him that the "contributions" to Oak Royal, the congregation of ULC which his charter represented that he had set up, were deductible. Petitioner opened accounts in the name of Oak Royal and made deposits into those accounts. He transferred certificates of deposit at various banks to Oak Royal and opened a brokerage account in the name of Oak Royal. Petitioner did not hide what had been done. On his tax return for the year 1979 he showed under contributions a claimed deduction of $110,000 to: "Oak Royal Universal Life Church." The bank accounts were in the name of Oak Royal and petitioner's transfers to these bank accounts could, in many instances, be ascertained from his own records. On his return for the calendar year 1980, he again showed under contributions supported by canceled checks, receipts, and so forth "Oak Royal Universal Life Church", $50,000 and on his tax return for the year 1981, again under contributions, showed *350 "Oak Royal Universal Life Church", $115,000. The entire actions of petitioner negate any deception with respect to the deductions he was taking. In fact, the name under which he showed these deductions on his return would alert respondent as to the very nature of the deductions. The lack of deception by petitioner, when buttressed by the fact that a certified public accountant who had been preparing his returns for a number of years told him that the deduction might be taken, mitigates a fraudulent intent on petitioner's part in taking these deductions. Respondent argues that the backdating of certain certificates of deposit (CDs), and the failure of petitioner to report interest that was accrued on these CDs prior to the date he instructed the bank to transfer them to Oak Royal, indicates fraud. However, the record shows that petitioner did not instruct the bank to reissue the CDs as of the date of original issue, but this was done by the bank on its own initiative. Having done this, petitioner did not receive in his own name notice from the bank of the interest on the CDs up until the date he asked the bank to transfer them. It may have been negligent on his part not to recognize *351 at that time what had happened and go back to the bank and have it corrected, but certainly there is no indication of fraud in his failure to do this. At the trial of these cases respondent relied primarily for his claim of fraud on the part of petitioner, on the Oak Royal deductions taken by petitioner for contributions to the congregation of ULC. However, in his brief he argues that the payments of amounts due to petitioner directly to Oak Royal by certain companies for which petitioner had rendered services, as well as certain other omissions from income, are an indication of fraud. The record shows that petitioner did not report the amounts which companies paid directly to Oak Royal for his services as income, but that he did not take a deduction for these amounts in computing his contributions to Oak Royal. This, of course, was an improper manner of handling these payments even had petitioner been correct that amounts transferred to Oak Royal were deductible contributions. However, if in fact contributions to Oak Royal had been deductible, the two items would, to at least an appreciable extent, have offset each other. Petitioner in having these payments made directly, relied *352 on information he received from ULC. Again, there is no indication of concealment by petitioner or any other indication that there was a fraudulent intent on his part, in having these payments made to Oak Royal. In fact, the record shows that petitioner, although having complete control over the Oak Royal account, in fact made no withdrawals from that account for the years here in issue. Petitioner testified that it had been his intent to accumulate this money as tax-free money because of his belief that the amount was deductible, and when a sufficient amount was accumulated, to use it for purposes of establishing funds for assistance to needy children and similar projects. Whether in fact petitioner had formulated a sufficient idea of what would be done with the money, to have a plan for its use, we doubt. His testimony about the planned use of the money for charitable undertakings to assist children was too vague to constitute any definite plan. However, the fact that he had no definite plan for the use of the funds does not establish fraud, when he did attempt to determine whether the amounts transferred to Oak Royal were deductible contributions. Also, the fact that the *353 tax advantages of paying these amounts over to Oak Royal were considered by petitioner does not establish fraud. Respondent also contends that the failure of petitioner to report certain constructive dividends resulting from payments his corporation Qup-Co. made to his corporation Stockwatch, indicates that petitioner fraudulently understated his income. Respondent cites numerous cases that consistent understatements of income, in and of themselves, are some indication of fraud. In the first place, although the fiscal year of Qup-Co. overlapped two of petitioner's years, the constructive dividend problem really arose only in one year. Also, the funds were not actually received by petitioner and his accountant testified that failure to report these funds on petitioner's returns for 1980 and 1981 was a mistake on his part. In fact, petitioners' accountant called the failure to report these amounts to the attention of respondent's agent. Certainly, this failure to report income from one transaction, resulting in constructive dividends to petitioner, is not clear and convincing evidence of fraud. We hold that respondent has failed to establish that any part of the underpayment *354 of tax in any of the years here in issue was due to fraud on the part of either petitioner. Petitioner contends that absent the establishment of fraud, any assessment of a deficiency for the year 1979 is barred by the statute of limitations. The record shows that petitioner's return for the calendar year 1979 was filed on April 15, 1980. Therefore, the three-year statute of limitations provided for in section 6501 expired on April 15, 1983. The notice of deficiency for the year 1979 was mailed to petitioners on September 1, 1983. Respondent contends that the statute did not expire until after September 1, 1983 because of the provisions of section 7609(e). This section suspends the statute of limitations if a notified person with respect to whose liability a summons is issued, or such person's agent, nominee or other person acting under the direction or control of the notified person, takes any action as provided in section 7609(b)(2). [2]Section 7609(e) provides as follows: Suspension of Statute of Limitations. -- If any person takes any action as provided in subsection (b) and such *355 person is the person with respect to whose liability the summons is issued (or is the agent, nominee, or other person acting under the direction or control of such person), then the running of any period of limitations under section 6501 (relating to the assessment and collection of tax) or under section 6531 (relating to criminal prosecutions) with respect to such person shall be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending. *356 It is petitioner's contention that he did not take any action as provided in subsection (b) when he was notified with respect to the summonses of records of his transactions with the banks at which he had established accounts in the name of Oak Royal. He contends that he had no objection whatsoever to the summonses being enforced, but he called someone at ULC, Modesto, California, in accordance with the instructions in the literature he had received from ULC and that at the request of the person with whom he spoke, mailed copies of the summonses to ULC. Petitioner states that he did not specifically state to the person with whom he talked at ULC in Modesto, California that he wished that person, or ULC, to act as his agent nominee, or under his direction or control, to stay compliance or intervene to bar enforcement of the summonses seeking to obtain records of petitioner's transactions with Oak Royal. It is respondent's position that the involvement by ULC in the action to summon records of Oak Royal, showing petitioner's transactions in connection with those accounts, was effectively action by ULC as petitioner's agent, nominee or a person under his direction or control. *357 Neither party cites any cases dealing with the circumstances that cause a suspension of the statute of limitations under the provisions of section 7609(e). We have found no cases helpful on this issue. Several cases have held that the Universal Life Church of Modesto does not have standing to challenge a summon issued to a ULC congregation church. Arthur W. Morris and Universal Life Church, Inc. v. United States,616 F.Supp. 246 (E.D. Mich. 1985); Universal Life Church, Inc. v. United States,582 F. Supp. 79, 80 (N.D. Cal. 1984). In Morris and Universal Life Church, Inc., the court in enforcing a summons upon a banking institution to turn over records pertaining to an account over which a "so-called minister" of Universal Life Church had signatory authority, stated as follows, 616 F. Supp. at 249: As a threshold matter, the Universal Life Church, Inc. does not have standing under sec. 7609(b)(2)(A) to challenge the summons issued for bank records in the name of Universal Life Church Assembly of the Brethren in Christ. Universal Life Church, Inc. v. United States,582 F. Supp. 79, 80 (N.D. Cal. 1984). The *358 Universal Life Church, Inc., headquartered in Modesto, California, is separate and distinct from its chapter or charter churches and not entitled to notice under sec. 7609(a). To argue that the Universal Life Church Assembly of the Brethren and Universal Life Church, Inc. are the same entity runs contrary to the tax exemption granted Universal Life Church, Inc. The exemption is not a group exemption; therefore, charter and chapter churches are not covered. Id.See also,Davis v. Commissioner,81 T.C. 806 (1983). Universal Life Church, Inc. will be dismissed from this action. [1]
Mr. Morris was the person who had signatory authority over the account of the chapter or charter of the Universal Life Church involved in the Morris and Universal Life Church, Inc. case from which we quoted above. Petitioner in the instant cases is in the same situation as Mr. Morris in the above-referred to case. We consider it clear that petitioner, the *359 party in interest here, chose to notify ULC, Modesto, of the summons and send a copy of the summons to it enabling it to intervene. Petitioner was sent a copy of the stay of compliance letters sent by ULC and did nothing to cancel them. It was necessary for respondent to bring enforcement proceedings in the District Court to have the summons enforced. Since the action taken by petitioner caused this enforcement proceeding to be necessary and thus respondent's investigation to be delayed, in our view ULC was an agent nominee or other person under petitioner's control within the meaning of section 7609(e). We reach the conclusion without reference to the general law of agency. Section 7609(e) was worded broadly in order to suspend the statute while respondent is unable to proceed with an investigation. When petitioner notified ULC and at its request sent it a copy of each summons, he in effect made it his agent, or nominee, to attempt to stay enforcement of the summons. In our view section 7609(e) was intended to apply where the notified person took action which caused the person summoned *360 to refuse to comply with the summons. Had petitioner not notified ULC, Modesto, the records would have been produced and enforcement of the summons not delayed. Therefore, we conclude that the statute was suspended during the time respondent was prohibited because of the action of ULC from obtaining the records needed to complete his investigation of petitioners' 1979 tax liability. Petitioner does not question respondent's computation of the number of days of the suspension or that if the statute was suspended it was open on September 1, 1983. We, therefore, hold that the statute of limitations did not bar assessment and collection of a deficiency for 1979 on September 1, 1983, when the notice of deficiency for that year was mailed to petitioners. Finally, we come to respondent's request that the Court award damages under section 6673. Clearly, this case was not brought frivolously or solely for the purpose of delay. The respondent determined fraud and petitioner was contesting that determination. Also the record shows that a number of other adjustments made in the statutory notice were conceded by respondent. Where there is a substantial issue in a case, it is not frivolous, *361 or brought merely for the purpose of delay. Therefore, based on this record, we deny respondent's request for the determination of damages against petitioner under section 6673. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 7609(a)(1)(A) and (B), and section 7609(b), provide as follows: SEC. 7609. SPECIAL PROCEDURES FOR THIRD-PARTY SUMMONSES. (a) Notice. -- (1) In General. If -- (A) any summons described in subsection (c) is served on any person who is a third-party recordkeeper, and (B) the summons requires the production of any portion of records made or kept of the business transactions or affairs of any person (other than the person summoned) who is identified in the description of the records contained in the summons, then notice of the summons shall be given to any person so identified within 30 days of the day on which such service is made, but no later than the 14th day before the day fixed in the summons as the day upon which such records are to be examined. Such notice shall be accompanied by a copy of the summons which has been served and shall contain direction for staying compliance with the summons under subsection (b)(2). * * * (b) Right To Intervene; Right To Stay Compliance. -- (1) Intervention. -- Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to intervene in any proceeding with respect to the enforcement of such summons under section 7604. (2) Right to stay compliance. -- Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to stay compliance with the summons if, not later than the 14th day after the day such notice is given in the manner provided in subsection (a)(2) -- (A) notice in writing is given to the person summoned not to comply with the summons, and (B) a copy of such notice not to comply with the summons is mailed by registered or certified mail to such person and to such office as the Secretary may direct in the notice referred to in subsection (a)(1).↩
1. The Court notes that Mr. Morris is the only party to sign the petition and constantly uses the singular form of petitioner. It is quite apparent that the real party of interest in this matter is only Mr. Morris.↩